IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LARRY JOHN SNYDER JR, | |
| Plaintiff, | **8:24CV435** |
| vs. | |
| DAKOTA CITY CORRECTIONAL FACILITY, et al.; | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the Court on Plaintiff Larry John Snyder, Jr.'s Complaint filed on November 7, 2024. Filing No. 1.[1] Plaintiff is currently incarcerated at the O'Brien County Jail in Primghar, Iowa. He was a pretrial detainee housed at the Dakota County Correctional Center (DCCC)[2] when the occurrences described in his filings occurred. The Court now conducts an initial review of Plaintiff's claims to determine whether summary dismissal is appropriate under 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A(b).

## I. SUMMARY OF COMPLAINT

Plaintiff has sued DCCC, and the doctor and nurse at that jail.[3] In addition to his complaint, Plaintiff has filed all his inmate request forms (Kites). Filing No. 1 at 4.

---

[1] Plaintiff has filed six supplements to the initial complaint, Filing Nos. 10, 12-16, all of which were also considered by the Court for this initial review.

[2] The caption on Plaintiff's complaint named the Dakota City Correctional Facility as a defendant, but his listing of defendants and addresses names the Dakota <u>County</u> Correctional Facility. Filing No. 1 at 2. The correct name for the detention facility is the Dakota County Correctional Facility, and DCCC will hereafter refer to that facility.

[3] In response to a Kite submitted by Plaintiff, DCCC identified Mary Brendan-Larson as the doctor, and Svendsen as the nurse. Filing No. 10 at 5.

Plaintiff was detained at DCCC pending federal criminal charges filed in the United States District Court for the Northern District of Iowa.[4] His filings of record include a litany of complaints about his pretrial confinement while detained at DCCC, including complaints about the medical care received, conditions of his confinement, the correctional officers' failure to protect him, discrepancies in his trust account, lack of response to his complaints, and issues with the DCCC rule book and its enforcement. After thoroughly reviewing all of Plaintiff's filings, the following summarizes his "Statement of Claims":

## A. Medical Care Complaints

Plaintiff was taking Paxil for anxiety and Trazadone for sleep before his arrest and detention. After being detained at DCCC, he went to the nurse, who dispensed medications to him from the jail's general stock rather than a prescription bottle with Plaintiff's name on the label. Apparently, the shape and/or color of the jail's stock prescription drugs was different than the pills he received from a pharmacy prior to his arrest. Plaintiff believed the nurse was distributing someone else's medication to him.

On October 10, 2024, Plaintiff complained that DCCC was not giving him the correct prescription medications. These complaints continued during his stay at DCCC. He alleges that sometimes he received a half tablet rather than a full one. He complained that the correctional officers would hand out medications, and he did not believe they were qualified to do so. Plaintiff was repeatedly assured that the jail's general stock pills may look different, but they were the same medications he received prior to his detention. Filing No.

---

[4] *See U.S. v. Larry John Snyder, Jr.*, 5:24-cr-04064 (N.D. Iowa). Snyder was indicted on September 19, 2024, and counsel was appointed to represent him on September 26, 2024. *Id.* at Filing No. 12. Snyder pleaded guilty on January 30, 2025, Filing No. 76, and he was sentenced on May 16, 2025. *Id.* at Filing No. 91.

1 at 3-4, 7, 10, 12, 15; Filing No. 10 at 1, 10; Filing No. 13 at 5-7, 11. Plaintiff was further advised that the DCCC correctional officers were certified to distribute medications and trained to do so. Filing No. 13 at 5. When Plaintiff asked why the correctional officers would not distribute aspirin, eye drops, and ear drops if they were qualified to distribute medications, he was told a doctor must first order all medications. Filing No. 12 at 7. Plaintiff believed DCCC was providing inadequate medical care in retaliation for filing a lawsuit against the jail. Filing No. 13 at 11.

On January 21, 2025, Plaintiff requested assignment to a lower bunk, complaining he is 44 years old and unable to climb up to the top bunk. Filing No. 12 at 1; Filing No. 13 at 2, 4. The request was denied. On February 2, 2025, Plaintiff repeated his demand for a lower bunk, this time claiming he had difficulty climbing to the top bunk due to several medical issues, including tendonitis in his knees, back problems, and bruised lungs and ribs. DCCC staff members stated they were unaware of these medical issues. Filing No. 15 at 5. On February 14, 2025, Plaintiff asked to see a doctor about his knee problems. He was asked to complete a medical authorization so DCCC could collect his past medical records documenting the knee issues. Filing No. 15 at 3, 9. Plaintiff interpreted this response as refusing to provide his requested medical care. Filing No. 15 at 4.

Plaintiff claims that as of late-March 2025, he had been sick for the entire five months of his confinement at DCCC and he needed antibiotics on two occasions. But Plaintiff does not explain his ongoing symptoms. He does not allege that he requested treatment for them, that any such requests (if any) were denied, that the cause was diagnosed by a medical professional, and the medical issues were attributable to conditions at DCCC. Filing No. 16 at 1.

**B. Conditions of Confinement**

**1. DCCC Maintenance**

Plaintiff complained that the general upkeep of the DCCC facility was poor. Intercom buttons for emergency response were not working, lights were not functioning, sinks were clogged and smelled, and there was mold on the walls. Filing No. 16 at 2, 5. Plaintiff does not allege any personal injury or harm due to these maintenance issues.

Since the jail refused to reassign Plaintiff to a bottom bunk, he moved his mattress to the floor next to a wall, and he slept there. Filing No. 13 at 4. On February 24, 2025, Plaintiff complained that while sleeping on the floor, ants crawled on him and bit him. DCCC staff gave him cleaning supplies and insecticide sprays to use in his cell. Plaintiff refused to use ant spray, stating he was not qualified to do so. Filing No. 15 at 7. DCCC submitted a work order to have the cell sprayed. On February 28, 2025, the cell was sprayed to kill the ants. Plaintiff claims the spray got on his mattress (which was lying on the floor). Plaintiff alleges he developed a contact skin rash from the spray, and less than a week later, he saw 50 live ants in his cell. These occurrences prompted Plaintiff to question whether the spray used was hazardous to humans and whether the person who sprayed the cells was qualified to do so. The DCCC nurse gave him cortisone cream for his rash. Filing No. 15 at 5, 7, 14, 16-17, 47 & 49.

Plaintiff vaguely describes an intermittent issue with water quality, complaining that on two occasions during his confinement at DCCC, he received only three bottles of drinking water for the day. He claims that while DCCC also provided milk and juice, these drinks did not address the problem of insufficiently available water. Filing No. 1 at 3-4; Filing No. 16 at 1, 4.

4

Plaintiff further alleges that when the water was contaminated, laundry could not be washed in clean water. Filing No. 1 at 4.

### 2. Housing assignment

Plaintiff was moved to a different cell without his consent. By February 10, 2025, Plaintiff was requesting a different cell assignment because his cellmate snored loudly, and Plaintiff was unable to sleep. These requests were denied. Filing No. 15 at 5, 23-24. Plaintiff believed his requests were denied due to retaliation for filing a lawsuit. Filing No. 15 at 23.

### 3. Protection

Plaintiff states he warned correctional officers that if he was not moved to a different cell, he and his cellmate would have a physical altercation. Plaintiff's request to move to a different cell was denied. Plaintiff alleges that in February 2025, his cellmate and the cellmate's friend attacked him in two separate incidents. His nose was cut and either the cellmate or his friend had a black eye. He alleges the correctional officer who witnessed the attacks did nothing to protect him. There is nothing of record indicating he received or needed medical care for his nose cut. Filing No. 14 at 1; Filing No. 15 at 25-26.

### 4. Hygiene

For a week, DCCC ran out of soap in the showers. Inmates were told they could obtain replacement soap from the commissary. Plaintiff claims this violated his rights because the amount of soap received from the commissary was insufficient for a full week and no shampoo was available. Filing No. 16 at 2-3.

### 5. Clothing

Plaintiff submitted 12 Kites complaining that the elastic in his pants was too loose; that his pants fell down unless he used a hair tie to cinch the waist. DCCC responded to Plaintiff's requests by issuing different and/or smaller size

pants. Filing No. 1 at 11, Filing No. 15 at 4, 27, 28, 30, 32-35, 37, 40, 42-44. But after addressing this complaint repeatedly for five months, on March 1, 2025, DCCC responded, "We are not going to keep fishing for pants for you." Filing No. 15 at 44.

### 6.    Access to the Court and Counsel

Plaintiff complained that as a federal detainee, he was entitled to be confined in a federal facility equipped with a federal library. He claimed that without a federal library, he was unable to defend himself in federal court. Filing No. 1 at 3; Filing No. 12 at 2-3; Filing No. 13 at 9-11; Filing No. 15 at 56. DCCC responded that the United States Marshals Service approved the facility for housing federal detainees and according to the Marshal's standards, the DCCC library was properly equipped. Filing No. 13 at 9.

Plaintiff states his name was initially misspelled in DCCC's records, and he was concerned his mail was not being delivered due to the mistake. DCCC assured him that the misspelling had not interrupted delivery of his mail. Filing No. 10 at 9.

Plaintiff was suspicious that his legal mail was tampered with because an envelope from his attorney allegedly took two weeks to arrive at DCCC, was delivered to him uncharacteristically early at 7:00 a.m., and when delivered, the end of the envelope was taped shut. He stated he was calling his lawyer to find out if she taped the envelope so he could prove DCCC opened his mail. Filing No. 15 at 8, 58. Assuming he made that call, Plaintiff has not included the lawyer's response in his filings.

Plaintiff informed DCCC of his intent to send legal documents to his wife and asked that the mailing be considered legal mail and not opened by the mailroom. DCCC reminded Plaintiff of the rules and denied Plaintiff's request. Filing No. 15 at 57.

### 7.  Visitation

Plaintiff complained that a visitation with his wife was denied for no apparent reason on December 12, 2024. Filing No. 13 at 10.

### 8.  Property

Plaintiff complains that money was removed from his trust account without his knowledge and without providing a receipt. He further alleges he noticed a mistake in his trust account, and DCCC corrected it only after Plaintiff brought it to the facility's attention. DCCC responded that it charged Plaintiff's account for the items he ordered, and if he ordered an indigent kit but had no money in his account at the time, the kit was delivered and the money withdrawn from Plaintiff's account when funds were available. Filing No. 1 at 4, 8, 13; Filing No. 15 at 10, 12. There are no allegations that Plaintiff ultimately paid for items he did not receive.

### 9.  Response to Complaints

Plaintiff complained that DCCC did not respond to and sign all his Kites. Filing No. 10 at 9, 11; Filing No. 13 at 12; Filing No. 15 at 21, 46. Plaintiff attempted to contact the Ombudsmen regarding his complaints, but the phone call would not connect. He sent a Kite asking for a solution to the problem. The jail responded by providing the phone numbers, advising Plaintiff that he was the first to complain of this problem, and stating DCCC would evaluate the cause and get it fixed. But in the meantime, DCCC staff encouraged Plaintiff to send his concerns by letter to the Ombudsmen. Filing No. 12 at 3.

### 10.  Rule Book

Plaintiff repeatedly complained that DCCC's rule book was not updated, all the rules were not enforced against inmates, and even the DCCC correctional officers were not following them. Filing No. 10 at 11; Filing No. 12 at 1-2; Filing No. 13 at 9; Filing No. 15 at 7-8, 53. As examples, he stated the

correctional officers use profane language when speaking to detainees, but detainees could be disciplined for using the same language, Filing No. 15 at 19, and the movie schedule was not followed—the channel was switched to football, Filing No. 15 at 55. Plaintiff claimed that as a federal detainee, he was required to follow federal rules, not the DCCC rules, and he should not have been placed in lockdown for 24 hours for crossing a yellow line in violation of DCCC rules. Filing No. 12 at 5. DCCC responded that "this has nothing to do with being a federal inmate. You will abide by our rules while you are housed here." Filing No. 12 at 5.

Plaintiff has not identified the relief he requests in this lawsuit. However, since Plaintiff is no longer detained at DCCC, a request for injunctive relief is moot. *Hanks v. Prachar*, 457 F.3d 774, 775 (8th Cir. 2006). The Court therefore interprets Plaintiff's complaint as a request for damages.

## I. APPLICABLE LEGAL STANDARDS ON INITIAL REVIEW

The Court is required to review in forma pauperis and prisoner complaints to determine whether summary dismissal is appropriate. *See* 28 U.S.C. § 1915(e); 28 U.S.C. § 1915A. The Court must dismiss a complaint or any portion of it that states a frivolous or malicious claim, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2); 28 U.S.C. § 1915A(b).

"The essential function of a complaint under the Federal Rules of Civil Procedure is to give the opposing party 'fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved.'" *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014) (quoting *Hopkins v. Saunders*, 199 F.3d 968, 973 (8th Cir. 1999)). Plaintiffs must set forth enough factual allegations to "nudge[ ] their claims across the

line from conceivable to plausible," or "their complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569-70 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

"A pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties." *Topchian*, 760 F.3d at 849 (internal quotation marks and citations omitted). This means that "if the essence of an allegation is discernible, even though it is not pleaded with legal nicety, then the district court should construe the complaint in a way that permits the layperson's claim to be considered within the proper legal framework." *Stone v. Harry,* 364 F.3d 912, 915 (8th Cir. 2004). However, even pro se complaints are required to allege facts which, if true, state a claim for relief as a matter of law. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980).

## II. DISCUSSION

Plaintiff seeks recovery under 42 U.S.C. § 1983. To recover under 42 U.S.C. § 1983, Plaintiff must show "the conduct complained of was committed by a person acting under color of state law," and this conduct deprived him of "rights, privileges, or immunities secured by the Constitution or laws of the United States." *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999). For the reasons stated below, whether considered individually or in the totality, Plaintiff's allegations fail to state a claim for recovery under 42 U.S.C. § 1983.

## A. Claim against DCCC

Whether a party, other than an individual or a corporation, has the capacity to be sued is determined "by the law of the state where the court is located." Fed. R. Civ. P. 17(b). Each county in Nebraska may sue and be sued

in its own name, Neb. Rev. Stat. § 23–101, but the same is not true of county departments. *See Winslow v. Smith*, 672 F. Supp. 2d 949, 964 (D. Neb. 2009) (sheriff's and county attorney's offices); *Griggs v. Douglas Cnty. Corr. Ctr.*, No. 8:07CV404, 2008 WL 1944557, at *1 (D. Neb. Apr. 29, 2008) (county corrections department). A lawsuit against DCCC, a department of Dakota County, is a suit against Dakota County.

Plaintiff appears to also have sued the DCCC doctor and the DCCC nurse as defendants. Assuming that is true, the Court will consider whether Plaintiff's complaint states a claim against the doctor and nurse in both their official and individual capacities.

A lawsuit against a public employee in his or her official capacity is a suit against the public employer. *Campbell v. State of Iowa, Third Jud. Dist. Dept. of Corr. Serv.*, 702 F.3d 1140, 1141 (8th Cir. 2013) (quoting *Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir.1999)). So, Plaintiff's claims against the DCCC doctor and DCCC nurse, in their official capacities, are claims against Dakota County.

To state a claim against Dakota County, Plaintiff must allege a county policy or custom caused his alleged injury. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007); *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). And even if an unconstitutional policy or custom is alleged, the entity cannot be held liable absent a threshold finding of individual liability on the underlying substantive claim. *McCoy v. City of Monticello*, 411 F.3d 920, 922 (8th Cir. 2005).

With the possible exception of Plaintiff's allegations about the DCCC rule book and, liberally construed, the lack of general facility maintenance (mold on walls, nonoperational lighting or intercom buttons, clogged sink plumbing), Plaintiff's complaint does not allege the existence of any Dakota

10

County policy or custom. And as to his complaints about the facility's rule book and general maintenance, Plaintiff has not alleged how an outdated rule book, failure to enforce certain rules, or the alleged lack of general maintenance adversely impacted him.

Plaintiff's claims against DCCC, and his official capacity claims against its doctor and nurse, must be dismissed.

## B. Individual Capacity Claims

### 1. Claims Against the DCCC Doctor and Nurse

Plaintiff alleges he received inadequate medical care. "When a pretrial detainee's Fourteenth Amendment claim alleges constitutionally deficient medical care, the Eighth Amendment deliberate-indifference standard applies." *Smith v. Eberhardt*, No. 8:23CV156, 2025 WL 2202722, at *5 (D. Neb. July 30, 2025) (citing *Scott v. Benson*, 742 F.3d 335, 339 (8th Cir. 2014)). The detainee must allege (1) he had an objectively serious medical need and (2) the defendants knew of the medical need but were deliberately indifferent to it. *See Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010); *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481–82 (8th Cir. 2008); *Albertson v. Norris*, 458 F.3d 762, 765 (8th Cir. 2006); *Grayson v. Ross*, 454 F.3d 802, 808–09 (8th Cir. 2006). Deliberate indifference is a stringent standard of fault. The plaintiff must allege and prove the county actor disregarded a known or obvious consequence of his action. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997).

A medical need is objectively serious "if the medical need in question is supported by medical evidence, such as a physician's diagnosis, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Hancock v. Arnott*, 39 F.4th 482, 486 (8th Cir. 2022) (quoting *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017)). As to the subjective element,

the Plaintiff must plead that each defendant acted with a sufficiently culpable state of mind. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). A plaintiff must show a prison official knew of and disregarded the plaintiff's objectively serious medical need. *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002).

Plaintiff's filings state his medical needs were not adequately addressed by the Dakota County medical staff, but Plaintiff has not alleged an objectively serious medical need. Prior to his arrest, Plaintiff was prescribed Paxil for anxiety and Trazadone for insomnia. Anxiety may or may not be severe and debilitating, and the same applies to insomnia. Here, Plaintiff provides no explanation of the severity of his underlying health issues or that his prescribed medications did not adequately address those issues. The Court notes that based on Plaintiff's Kites and handwritten explanations filed of record, it appears Plaintiff was fully able to function while confined in DCCC without severe symptoms of anxiety or insomnia that could be medically treated.

Plaintiff has also failed to show the DCCC medical staff was deliberately indifferent to his medical needs. Plaintiff's complaint, Kites, and supplemental submissions allege he wanted prescription medications from a pharmacy container with his name on it and not from DCCC's general stock because he did not trust the contents of the general stock pills. Plaintiff does not allege that the DCCC medical staff refused to provide his prescription medications. Rather, they chose to obtain it from a source that did not meet with Plaintiff's approval. DCCC was not deliberately indifferent to Plaintiff's medical needs merely because Plaintiff did not trust DCCC's source of prescription pharmaceuticals.

Plaintiff claims he had tendonitis in his knees, but there is nothing of record indicating he was diagnosed with this condition, that it was serious, or

12

that prior to February 14, 2025, the DCCC medical staff had reason to know he had tendonitis. When Plaintiff did disclose the problem with his knees, the medical staff requested consent to collect his prior medical records—a prudent step indicating the doctor and nurse were considering, not disregarding, Plaintiff's complaints. And requesting a thorough medical history, including prior medical records, is not an act of retaliation against Plaintiff for filing a lawsuit.

Finally, Plaintiff claims he felt ill the entire time he was housed at DCCC. His filings indicate he received antibiotics twice while confined there. He has not alleged that his ongoing symptoms were severe, diagnosed as serious, or that he reported them to the medical staff but was ignored.

Plaintiff's claims against the DCCC doctor and DCCC nurse, in their individual capacities, must be dismissed.

## 2.  Remaining Allegations

Plaintiff has raised several additional complaints about the circumstances he faced during his DCCC confinement without alleging who, specifically, was responsible. To state a § 1983 claim, a plaintiff must allege that the defendant was personally involved in or had direct responsibility for incidents that resulted in injury. *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985).

The Court has considered whether to permit Plaintiff to file an amended complaint to name those he believes personally caused his alleged problems while confined at DCCC. However, if the facts described in Plaintiff's lengthy submissions do not state a potentially viable § 1983 claim, naming additional defendants will not change that. So, the Court will now consider whether Plaintiff's remaining allegations sufficiently state a claim.

### a.  Conditions of Confinement

Plaintiff raises several complaints about the conditions of his confinement. The Eighth Circuit has determined that a conditions-of-confinement claim brought by a pretrial detainee should be analyzed using an objective "punishment" standard, rather than a subjective "deliberate indifference" standard. *See Stearns v. Inmate Servs. Corp.*, 957 F.3d 902 (8th Cir. 2020). The government may detain persons pending trial and "may subject [them] to the restrictions and conditions of [a] detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979).

> The Court [in *Bell*] articulated two ways to determine whether conditions rise to the level of punishment. A plaintiff could show that the conditions were intentionally punitive. Alternatively, if there is no expressly demonstrated intent to punish, the plaintiff could also show that the conditions were not reasonably related to a legitimate governmental purpose or were excessive in relation to that purpose. If conditions are found to be arbitrary or excessive, it is permissible to infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

*Stearns*, 957 F.3d at 907 (internal quotation marks and citations omitted).

Plaintiff raises complaints about the maintenance of the DCCC facility, his housing assignment, inadequate protection from assault, lack of hygiene products, ill-fitting clothing, the lack of a federal library, how his mail was handled, and being unable to see his wife.

Plaintiff claims the general maintenance of DCCC was poor, stating sinks were clogged, intercom buttons and overhead lights were not working, and there was mold on the walls. He does not allege how any of these conditions impacted him personally, or the extent of the problems and the length of time they existed. Plaintiff's vague allegations of poor maintenance fail to state a claim that he was punished while confined in DCCC in violation of the

14

Fourteenth Amendment. *Cody v. City of St. Louis for and on behalf of Medium Sec. Institution*, 103 F.4th 523, 531 (8th Cir. 2024) (holding detainee's conditions of confinement claims concerning plumbing, mold, and pests turn on both the severity of the conditions plaintiff faced, and the length of plaintiff's exposure to those conditions).

Plaintiff alleges there were ants in his room, but he also alleges that when he reported them, he was promptly given cleaning supplies and insecticide spray. He refused to spray the ants, so DCCC placed a work order and within a week, the ants were sprayed. During this time, Plaintiff was sleeping on a mattress on the floor adjacent to a wall because he claimed he could not climb to a top bunk. Plaintiff alleges ants crawled on him and bit him when he was laying on his mattress. He further alleges the spray gave him contact dermatitis, and, less than a week after the ants were sprayed, he noticed the ants were not fully eradicated. Plaintiff does not allege that he again reported the ants or, if he did, how DCCC responded.

While ants were no doubt bothersome, particularly for someone sleeping on the floor, Plaintiff's allegations do not support a claim that the existence of ants in his cell rose to the level of punishment—particularly since upon reporting the issue, DCCC promptly gave Plaintiff cleaning products and insecticide spray, but he chose not to use the spray. So, DCCC maintenance personnel sprayed Plaintiff's cell less than a week later. Plaintiff was not punished by being forced to endure the discomfort of an insect infestation for a significant period of time. He has failed to state a constitutional claim based on the existence of ants in his cell. *Obama v. Burl*, 477 F. App'x. 409 (8th.Cir. 2012) (holding inmate's allegation that his cell had spiders, beetles, and ants was insufficient where the inmate failed to provide a clear indication of the extent of the problem); *Lewis v. Stout*, No. 3:18-CV-02209, 2022 WL 2176321,

at *12 (S. D. Ill. June 16, 2022) (allegations that cell was infested with ants, medical personnel had to remove bugs from the inmate's ears on several occasions, and he suffered from ear infections did not prove an Eighth Amendment claim where cleaning supplies were distributed and the problem was short-lived); *Jones v. Dittman*, No. 17-CV-854, 2020 WL 224341, at *3 (W.D. Wis. Jan. 15, 2020) (dismissing Eighth Amendment claim where the plaintiff alleged he was bitten by bugs for a week and received medical care for the bites); *Osborne v. Meisner*, No. 17-CV-754, 2018 WL 1953926, at *7 (E.D. Wis. Apr. 25, 2018) (granting summary judgment in favor of defendants where the plaintiff argued he was bitten by bugs in his cell for one and a half weeks).

Plaintiff claims there were two incidents over a five-month period when DCCC would not allow detainees to drink water from the faucet due to contamination. Instead, the facility provided every detainee three bottles of water per day, plus milk and juice to drink. Whatever the reason for the contamination, the problem was not ongoing, DCCC responded reasonably, and Plaintiff cannot contend that he was punished in violation of the Fourteenth Amendment when he had to drink bottled water, juice, and milk instead of tap water on two occasions.

Plaintiff claims he received inadequate hygiene supplies and clothing. The jail's soap supply was depleted for a week and he needed to use a supply provided by the commissary, which did not include shampoo. Plaintiff claims the amount of soap received from the commissary was insufficient to last for a week. This allegation does not support a claim that Plaintiff was punished in violation of the Fourteenth Amendment due to lack of soap. *Harris v. Fleming*, 839 F.2d 1232, 1234 (7th Cir. 1988) (ten-day soap deprivation was not a constitutional violation); *Wallin v. Alfaro*, No. 1:03CV00281, 2005 WL

2125224, at *8 (D. Colo. Sep. 2, 2005) (thirteen-day soap deprivation not violation).

Plaintiff claims he consistently needed to use a hair tie to cinch the waistband of his pants because the elastic was too loose. Plaintiff was not denied pants. In fact, DCCC repeatedly allowed him to exchange the pants distributed for something that fit him better. Plaintiff was not unconstitutionally punished by receiving pants that would not stay up without a hair tie. *See, e.g.*, *Goss v. Bd. of Cnty. Comm'rs of Creek Cnty.*, 645 F. App'x. 785, 792 (10th Cir. 2016) (distributing ill-fitting clothing to a detainee is not sufficiently serious to rise to the level of a constitutional violation); *Young v. Berks Cnty. Prison*, 940 F. Supp. 121, 124 (E.D. Pa. 1996) (considered objectively, being deprived of pants that fit properly was not sufficiently serious to be unconstitutional).

Plaintiff alleges he needed the lower bunk and a different roommate. Plaintiff claimed that, at the age of 44, he was unable to climb to the top bunk. When that request was denied, he claimed he needed a lower bunk due to medical issues, and in response, DCCC requested Plaintiff's consent to review his prior medical records—a request Plaintiff interpreted as an act of retaliation. Being assigned to a top bunk was not punishment in violation of the Fourteenth Amendment where Plaintiff had no known and verified medical need for a lower bunk during his confinement at DCCC.

Plaintiff was moved without his consent to a different cell. He then asked for a different cellmate because his new cellmate snored. That request was denied. Plaintiff was not unconstitutionally punished when he was housed with a snoring cellmate.

Plaintiff claims his rights were violated because DCCC did not have a federal library. Plaintiff was represented by counsel while detained at DCCC.

The lack of access to a law library or law books does not deny a pretrial detainee access to courts if he has an attorney. *Turner v. Long*, No. 8:24CV492, 2025 WL 1267308, at *6 (D. Neb. May 1, 2025) (citing *Bounds v. Smith*, 430 U.S. 817, 822 (1977)).

Plaintiff suspects that his legal mail was improperly handled. His allegations are conclusory and based on supposition, not fact. They do not support a claim for violation of his ability to confidentially communicate with counsel. Moreover, even assuming the DCCC mailroom opened Plaintiff's legal mail, an isolated, inadvertent instance of opening incoming confidential legal mail does not support a § 1983 damage action. *Beaulieu v. Ludeman*, 690 F.3d 1017, 1037 (8th Cir. 2012). "[A]n isolated incident, without any evidence of improper motive or resulting interference with the inmate's right to counsel or access to the courts, does not give rise to a constitutional violation." *Id.* (quoting *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997)).

Plaintiff alleges that for no apparent reason, he was not permitted to visit with his wife on one occasion. This allegation fails to state a constitutional claim. *Block v. Rutherford*, 468 U.S. 576, 589 (1984) (holding denial of all contact visits to pretrial detainees for over 30 days does not violate the due process clause of the Fourteenth Amendment).

Plaintiff has failed to state any claim for punitive conditions of confinement in violation of the due process clause of the Fourteenth Amendment.

### b. Failure to Protect

Plaintiff warned guards that if he did not get a different cellmate, a fight would break out. He did not get a new cellmate and states he was attacked by his cellmate and the cellmate's friend. Plaintiff claims the guards failed to protect him before and during the fight.

18

To state a claim for unconstitutional failure to protect from harm, a detainee must show (1) an objectively and sufficiently serious deprivation, meaning the conditions of his detention posed a substantial risk of serious harm, and (2) the defendant was deliberately indifferent to the substantial risk of serious harm; that the defendant was aware of facts from which it could be inferred, and the defendant actually inferred, that a substantial risk of serious harm existed. *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041 (8th Cir. 2015) (citing *Schoelch v. Mitchell*, 625 F.3d 1041, 1046 (8th Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 834 (1994))). The detainee must allege and prove that the harm caused by the alleged failure to protect was objectively serious. *Id*.

Plaintiff alleges he asked to be moved to a different cell, and when his request was denied, he told DCCC staff that being housed with his cellmate "was going to end in a fight." Filing No. 14 at 1.[5] These allegations do not sufficiently allege that correctional officers were "aware of facts from which the inference could be drawn that a *substantial risk* of *serious harm* exists." *Chavero-Linares*, 782 F.3d at 1041 (emphasis in original) (quoting *Schoelch*, 625 F.3d at 1046).

Plaintiff alleges two fights occurred; one with his cellmate and the other with his cellmate's friend. He describes one of those fights as a "fist fight."

---

[5] Based on the filings of record, Plaintiff did not file a grievance about the guards' failure to respond to a threat of violence. Instead, he gave an ultimatum: Violence will happen unless my demand for a different cellmate is met. Acceding to such demands can undermine prison security, and making these threats can subject a detainee or inmate to discipline. *Cobian v. McLaughlin*, 717 F. App'x 605, 612 (7th Cir. 2017). "Prison administrators must deal with numerous and broad-ranging prisoner complaints and accusations. Some of these are motivated by a true intention to obtain assistance concerning problems encountered with another inmate. Other complaints, however, are not the result of such pure motives." *Copeland v. Lanham*, 17 F.3d 1433, 1994 WL 64748, at *5 (4th Cir. 1994). In the absence of a clearly stated substantial risk of serious harm, security and administrative concerns constrain prison officials from accommodating a complaining inmate by allowing inmates to move to cells that are more to their liking. *Id*.

Filing No. 15 at 3. In the end, Plaintiff's nose was cut and either the cellmate or his friend had a black eye. Filing No. 14 at 1. Plaintiff does not allege he sought or needed medical care for his injuries. While Plaintiff alleges DCCC staff failed to protect him during and after these altercations, his nose cut was not "objectively serious" as required to support a constitutional claim for failure to protect. *Chavero-Linares*, 782 F.3d at 1042 (detainee altercation which resulted in only a minor cut and a mild, but undiagnosed and asymptomatic, concussion did not state a § 1983 claim for failure to protect a detainee); *see also Jordan v. Gifford*, No. 3:19-CV-1628, 2023 WL 2895883, at *7 n.7 (D. Conn. Apr. 11, 2023) ("[T]emporary injuries such as a black eye or busted lip are generally not considered objectively serious medical conditions of a constitutional dimension."); *Louime v. Lamanna*, No. 21-CV-9594, 2023 WL 1385180, at *6 (S.D.N.Y. Jan. 31, 2023) (bruising and lacerations to the head and face, pain, and blurry vision are minor, temporary injuries which are not "objectively serious" for constitutional purposes); *Powell v. Fugate*, 364 F. Supp. 3d 709, 728 (E.D. Ky. 2019) (swollen black eyes and a "busted" lip were insufficiently serious injuries for an deliberate indifference claim); *Rojas v. Brown*, No. 1:17-CV-01514, 2018 WL 4183269, at *17 (E.D. Cal. Aug. 30, 2018) (a black eye and bruising does not establish a serious medical need); *Gonzalez v. Lusardi*, 930 F. Supp. 2d 840, 854–55 (E.D. Ky. 2013) (a black eye is not sufficiently serious for a deliberate indifference claim); *Gerber v. Sweeney*, 292 F. Supp. 2d 700, 707-08 (E.D. Penn. 2003) (finding a black eye and laceration were not serious medical needs); *Ford v. Davis*, 878 F. Supp. 1124, 1130 (N.D. Il. 1995) (holding that a swollen face, two black eyes, bruised ribs and a bruised back were not serious wounds).

Plaintiff has failed to allege a claim for failure to protect in violation of his Fourteenth Amendment due process rights.

### c. Unanswered Kites

Plaintiff complains that several of his Kites were not answered, signed, and/or returned. An inmate does not have a protected liberty or property interest in access to the grievance procedure. *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991). The failure of DCCC staff "to acknowledge receipt of and respond to plaintiffs' grievances pursuant to prison procedure did not violate any of plaintiffs' constitutional rights." *Fallon v. Coulson*, 5 F.3d 531, 1993 WL 349355, at *1 (8th Cir. 1993).

### d. Trust Account Issues

Plaintiff claims DCCC charged his trust account without giving him receipts; it charged the account for an item he did not receive and did not correct the mistake until he raised the issue; and it belatedly charged him for an indigent kit. In the end, Plaintiff has not alleged he was charged for anything he did not receive. He cannot state a claim for mishandling his trust funds.

Plaintiff also claims indigent kits should have been free, but DCCC was not constitutionally required to give them away.

### e. Inaccurate, Unenforceable, and Inconsistent Rule Enforcement

Plaintiff raises many issues about the DCCC rule book.

He claims he was improperly disciplined for violating a DCCC rule because as a federal detainee, federal rules and not county jail rules governed his conduct. Plaintiff is incorrect. While housed at DCCC, he was subject to its rules.

Plaintiff alleges the DCCC rules were not always enforced, and they were not followed by the correctional officers but enforced against inmates. He explains that contrary to the rules, the television channel was often changed to watch football when it was supposed to be televising a movie; inmates and

21

officers would bet on games in violation of DCCC rules; and officers yelled at him, sometimes using profanity, but he could be disciplined under the DCCC rules for similar conduct. He does not allege he was harmed (other than perhaps missing a movie) because of DCCC's alleged inconsistent enforcement of its rules. Plaintiff's allegations fall far short of claiming arbitrary or discriminatory rule enforcement in violation of Plaintiff's constitutional rights.

Plaintiff claims that updates to the DCCC rule book were inaccurate or inconsistent. But he does not state how any of the alleged inaccuracies he identified personally harmed him. He therefore lacks standing to raise any claim arising from alleged errors in the DCCC rule book. *Denmon v. Kansas Counselors, Inc.*, --- F.4th ---, 2025 WL 2329189, at *1 (8th. Cir. Aug. 13, 2025).

Plaintiff has failed to allege any constitutional claims based on the DCCC rule book and its enforcement.

### f.  Conditions of Confinement Claims Considered as a Whole

To summarize, the Court has evaluated each of Plaintiff's claims to determine whether granting leave to amend to add named defendants is warranted and, if so, for which claims. Considered individually, none of Plaintiff's non-medical complaints state a claim such that granting leave to add named defendants is warranted.

However, the Court must also review the totality of the circumstances to determine whether, considered as a whole, Plaintiff's pretrial detention at DCCC was unconstitutionally punitive. *Morris v. Zefferi*, 601 F.3d 805, 810 (8th Cir. 2010). In this case, during his five or six months of DCCC confinement, Plaintiff experienced receiving prescriptions from DCCC's general stock and not a private prescription bottle; being unable to secure a lower bunk and therefore sleeping on a mattress on the floor; having a cellmate who snored loudly; having biting ants in his cell for a two-week time period;

having contact dermatitis from ant spray and needing to apply cortisone cream; drinking bottled water, milk, and juice instead of tap water on two occasions; having to monitor his trust fund assets to assure accurate accounting; watching some inmates and correctional officers flaunt the DCCC rules, including betting on sports and turning the television channel from a movie to football; having time periods where intercom buttons for emergency response were not working, some lights were not functioning, some sinks were clogged and smelled, and mold was on the walls; having insufficient access to soap and shampoo for a week; wearing pants with a loose waist or a waist cinched with a hair tie; waiting for Kite responses and signed responses that never came; being concerned that his legal mail was opened by DCCC staff; and being unable to use a federal library while represented by appointed counsel.

While Plaintiff alleges he has "never been in a jail like this," Filing No. 13 at 10, his lengthy list of allegations, whether considered individually or in the totality, do not rise to the level of punitive pretrial detention in violation of Plaintiff's constitutional rights.

## IV. CONCLUSION

The Court is required to dismiss a complaint, or any portion of it, that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

Plaintiff has failed to state a claim against DCCC and against its doctor and nurse in their official and individual capacities. As to the non-medical complaints, even assuming Plaintiff had named defendants personally responsible, he has failed to state a claim for recovery under 42 U.S.C. § 1983. The complaint must be dismissed.

23

IT IS THEREFORE ORDERED:

1.    This matter is dismissed without prejudice.

2.    A separate judgment will be entered.

Dated this 4th day of September, 2025.

BY THE COURT:

John M. Gerrard
Senior United States District Judge